UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| ISRAEL MENDIVIA,<br><br>   Plaintiff,<br><br>  v.<br><br>MICHAEL J. ASTRUE,<br>COMMISSIONER OF SOCIAL<br>SECURITY ADMINISTRATION,<br><br>   Defendant. | No. ED CV 09-2173-PLA<br><br><br><br>**MEMORANDUM OPINION AND ORDER** |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on December 2, 2009, seeking review of the Commissioner's denial of his applications for Supplemental Security Income payments and Disability Insurance Benefits. The parties filed Consents to proceed before the undersigned Magistrate Judge on December 22, 2009, and January 19, 2010. Pursuant to the Court's Order, the parties filed a Joint Stipulation on October 15, 2010, that addresses their positions concerning the disputed issues in the case. The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## BACKGROUND

Plaintiff was born on January 23, 1955. [Administrative Record ("AR") at 38, 55.] He has a third grade education [AR at 218], and has no past relevant work experience. [AR at 52, 58.]

On July 19, 2006, plaintiff protectively filed his applications for Supplemental Security Income payments and Disability Insurance Benefits, alleging that he has been unable to work since July 1, 2006, due to, among other things, mental illness. [AR at 38-42, 197-99, 214-22.] After his applications were denied initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). [AR at 72-75, 77-83.] A hearing was held on April 22, 2009, at which time plaintiff appeared with counsel, but did not testify on his own behalf. A vocational expert ("VE") and a medical expert also testified, and a Spanish-language interpreter translated at the hearing. [AR at 43-54.] On July 29, 2009, the ALJ determined that plaintiff was not disabled. [AR at 8-22.] The Appeals Council denied plaintiff's request for review of the hearing decision on September 30, 2009. [AR at 1-3.] This action followed.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at 1257. When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). Where the evidence is susceptible to more than one rational interpretation, the Court

must defer to the decision of the Commissioner.  Moncada, 60 F.3d at 523; Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995); Drouin, 966 F.2d at 1258.

## IV.
## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d)(1)(A); Drouin, 966 F.2d at 1257.

**A.   THE FIVE-STEP EVALUATION PROCESS**

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied.  Id.  If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id.  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled and the claim is denied.  Id.  The claimant has the burden of proving that he is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a prima facie

case of disability is established. The Commissioner then bears the burden of establishing that the claimant is not disabled, because he can perform other substantial gainful work available in the national economy. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

**B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

In this case, at step one, the ALJ found that plaintiff had not engaged in any substantial gainful activity since July 28, 2006. [AR at 16.] At step two, the ALJ concluded that plaintiff has the "severe" impairments of "Depressive Disorder, not otherwise specified; and Personality Disorder, not otherwise specified." [Id.] At step three, the ALJ determined that plaintiff's impairments do not meet or equal any of the impairments in the Listing. [Id.] The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[1] to "perform a full range of work at all exertional levels but with the following non-exertional limitations: moderately complex tasks up to 4 to 5 step instructions; in a habituated setting; no hypervigilance required; not involved in safety operations; and avoid ... hazardous machinery." [AR at 18-19.] At step four, the ALJ concluded that plaintiff does not have any past relevant work experience. [AR at 21.] At step five, the ALJ found, based on use of the Medical-Vocational Rules as a framework and the VE's testimony, that plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." [See AR at 22.] Accordingly, the ALJ determined that plaintiff is not disabled. [Id.]

/
/
/
/

---

[1]    RFC is what a claimant can still do despite existing exertional and nonexertional limitations. Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

4

# V.

## **THE ALJ'S DECISION**

Plaintiff contends that the ALJ: (1) did not adequately address plaintiff's illiteracy in finding him able to work; and (2) should have found that he has the severe impairment of schizophrenia. [Joint Stipulation ("JS") at 2-3.] As set forth below, the Court agrees with plaintiff, in part, and remands the matter for further proceedings.

**A.    THE ALJ'S RELIANCE ON THE VE'S TESTIMONY**

Plaintiff contends that the ALJ erred in relying on the VE's testimony in concluding at step five of the sequential analysis that plaintiff can perform other work. Specifically, plaintiff contends that the two jobs identified by the VE require literacy levels that are inconsistent with plaintiff's English language illiteracy, and that the VE did not explain how plaintiff could perform the jobs identified given this apparent conflict. [JS at 3-5.]

At step five of the sequential evaluation process, the burden shifts to the Commissioner to prove that, based on plaintiff's RFC, age, educational level, and past work experience, he can perform some type of substantial gainful activity that exists in significant numbers in the national economy. See Smolen v. Chater, 80 F.3d 1273, 1291 (9th Cir. 1996); see also 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c), 404.1564, 416.920(a)(4)(v), 416.960(c), 416.964; Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) ("[T]he Secretary bears the burden of proof at step five, which determines whether the claimant is able to perform work available in the national economy."). Under the regulations, a claimant's educational level means, among other things, "formal schooling or other training which contributes to [a claimant's] ability to meet vocational requirements," and "how well [a claimant is] able to communicate in English since this ability is often acquired or improved by education." 20 C.F.R. §§ 404.1564, 416.964. In evaluating a claimant's educational level, the Commissioner uses categories that include, among others, "[i]lliteracy" and "[i]nability to communicate in English." Id. A claimant is illiterate if he or she "cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no

formal schooling." 20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1). With regard to a claimant's ability to communicate in English, the regulations provide that "[b]ecause English is the dominant language of the country, it may be difficult for someone who doesn't speak and understand English to do a job, regardless of the amount of education the person may have in another language. Therefore, we consider a person's ability to communicate in English when we evaluate what work, if any, he or she can do. It generally doesn't matter what other language a person may be fluent in." 20 C.F.R. §§ 404.1564(b)(5), 416.964(b)(5).

In the decision, the ALJ noted that plaintiff "is not able to communicate in English" and is considered to be "an individual who is illiterate in English." [See AR at 21, citing 20 C.F.R. § 416.964.] At the hearing, the ALJ asked the VE whether a person of plaintiff's age, with the RFC identified in the decision (and set forth above), with a marginal education,[2] and with an inability to communicate in English could work. [AR at 52-53.] The VE responded that plaintiff could perform two jobs provided in the Dictionary of Occupational Titles ("DOT"): electronics worker (DOT No. 726.687-010) and hand packager, inspector (DOT No. 559.687-074). [AR at 53.]

All jobs listed in the DOT have general education development ("GED") levels -- defined as "aspects of education (formal and informal) which are required of the worker for satisfactory job performance." DOT, Appendix C - Components of the Definition Trailer, 1991 WL 688702 (1991). A job's GED level pertains to, among other things, the language development level necessary to perform a job, which includes the reading and writing skills required to perform a job, ranging from 1 (the lowest level) to 5 (the highest level). Id. The two jobs that the VE said plaintiff can perform both have a language development level of two, which requires reading skills that include "[p]assive vocabulary of 5,000-6,000 words," and abilities to "[r]ead at rate of 190-215 words per minute[;] [r]ead adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation[;] [and] [r]ead instructions for assembling model cars and

---

[2] According to the regulations, "[m]arginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education." 20 C.F.R. §§ 404.1564(b)(2), 416.964(b)(2).

airplanes." Level two language development writing skills include an ability to "[w]rite compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs." DOT, Appendix C - Components of the Definition Trailer, 1991 WL 688702 (1991).

"[T]he best source for how a job is generally performed is usually the [DOT]," and for an ALJ to properly conclude that a job is generally performed in a manner "that contradicts the [DOT], the record must contain 'persuasive evidence to support the deviation.'" Pinto v. Massanari, 249 F.3d 840, 845-46 (9th Cir. 2001) (quoting Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995)). Since the ALJ asserted in the decision that plaintiff's inability to communicate in English renders him effectively illiterate, it appears that the two jobs identified by the VE -- both of which require level two GED reading and writing skills -- are incompatible with plaintiff's inability to read or write in English. Yet neither the VE nor the ALJ explained how plaintiff would be able to perform the two jobs identified by the VE despite plaintiff's seemingly contradictory educational limitations. As such, substantial evidence does not support this apparent deviation between plaintiff's illiteracy and how the jobs identified by the VE are performed according to the definitions provided in the DOT. Accordingly, remand is required on this issue.[3]

---

[3] Respondent apparently contends that "[e]ven if the ... ALJ erred by relying on the VE testimony, the error would be harmless" because the ALJ could have relied exclusively on the Medical Vocational guidelines (the "grids") to find plaintiff not disabled. [JS at 7, citing 20 C.F.R., Pt. 404, Subpt. P, App. 2, § 204.00.] Respondent also quotes § 201.00(h)(4)(i) of the grids, which provides that "[w]hile illiteracy or the inability to communicate in English may significantly limit an individual's vocational scope, the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people) and in these work functions at the unskilled level, literacy or ability to communicate in English has the least significance. ... Thus, the functional capability for a full range of sedentary work represents sufficient numbers of jobs to indicate substantial vocational scope for those individuals age 18-44 even if they are illiterate or unable to communicate in English." 20 C.F.R., Pt. 404, Subpt. P, App. 2 § 201.00(h)(4)(i).

The Commissioner (or ALJ) may meet his step-five burden of showing that plaintiff is capable of performing other work in one of two ways: (1) by obtaining testimony from a VE, or (2) by referencing the grids. Lounsburry v. Barnhart, 468 F.3d 1111, 1115 (9th Cir. 2006). "Where a claimant suffers only exertional limitations, the ALJ must consult the grids. Where a claimant suffers only non-exertional limitations, the grids are inappropriate, and the ALJ must rely on other evidence. Where a claimant suffers from both exertional and non-exertional limitations, the ALJ must consult the grids first." Id. (internal citations omitted). However, when a claimant has both exertional and non-exertional limitations, "the grids are inapplicable [w]hen a claimant's non-
(continued...)

**B.    SCHIZOPHRENIA AS A SEVERE IMPAIRMENT**

Plaintiff argues that the ALJ erred in not finding his provisional diagnosis of schizophrenia to be a severe impairment at step two of the sequential evaluation.  [JS at 8-16.]  Specifically, plaintiff asserts that in concluding that he is "able to function on medication, [...] as long as he remains compliant," the ALJ "cherry pick[ed]" portions of the treatment notes of plaintiff's treating physician, Dr. Marissa Mejia, while ignoring evidence in the same treatment notes concerning plaintiff's symptoms of schizophrenia .  [JS at 9, quoting AR at 20.]

A "severe" impairment, or combination of impairments, is defined as one that significantly limits physical or mental ability to do basic work activities.  See 20 C.F.R. §§ 404.1520, 416.920.  Despite use of the term "severe," most circuits, including the Ninth Circuit, have held that "the step-two inquiry is a de minimis screening device to dispose of groundless claims."  Smolen, 80 F.3d at 1290 (citing Bowen v. Yuckert, 482 U.S. at 153-54); see Hawkins v. Chater, 113 F.3d 1162, 1169 (10th Cir. 1997) ("A claimant's showing at level two that he or she has a severe impairment has been described as 'de minimis'") (citation omitted); see also Hudson v. Bowen, 870 F.2d 1392, 1396 (8th Cir. 1989) (evaluation can stop at step two only when there is no more than minimal effect on ability to work).

---

³(...continued)
exertional limitations are sufficiently severe so as to significantly limit the range of work permitted by the claimant's exertional limitations."  Hoopai v. Astrue, 499 F.3d 1071, 1075 (9th Cir. 2007) (internal quotations and citation omitted).  In the decision, the ALJ's RFC determination included only non-exertional limitations [see AR at 18-19], and he determined that plaintiff's "ability to perform work at all exertional levels has been compromised by non-exertional limitations."  [AR at 21.]  Since it appears that plaintiff's non-exertional limitations are sufficiently severe to significantly limit his ability to do the range of work permitted by his lack of exertional limitations, exclusive reliance on the grids would have been inappropriate in this case.  See Hoopai, 499 F.3d at 1075; see also Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988) (where a claimant is only limited by non-exertional impairments, "the grids do not apply, and the testimony of a vocational expert is required to identify specific jobs within the claimant's abilities"); Cooper, 880 F.2d at 1155 ("where a claimant suffers solely from a nonexertional impairment, the grids do not resolve the disability question") (internal footnote omitted).  Moreover, plaintiff was 54 years old at the time of the hearing and the ALJ's decision.  Thus, § 201.00(h)(4)(i), relevant to claimants 18 to 44 years of age, is not applicable to plaintiff.  See 20 C.F.R., Pt. 404, Subpt. P, App. 2 § 201.00(h)(4)(i).

According to the treatment records, plaintiff received mental health treatment from the San Bernardino County Department of Behavioral Health from October 23, 2006, to at least February 27, 2009, during which time plaintiff was seen by Dr. Mejia at least 12 times. [See AR at 322-41, 352-70, 374-81; see also JS at 10-13, 20-23.] On December 1, 2006, Dr. Mejia examined plaintiff, observing, among other things, that he was "a poor historian" and "unable to give a detailed history" of his mental illness, "appeared to be responding to internal stimuli," had poor attention and questions had to be asked of him repeatedly before he would answer, had tangential and disorganized thought process, had poor insight, and was not oriented to time. [AR at 330-31.] Dr. Mejia noted that plaintiff reported hearing voices telling him to kill himself, that he had been psychiatrically hospitalized in Missouri for nine months, and that he had been detained in an United States immigration prison for 21 years until he was released in 2004. [AR at 330.] Dr. Mejia diagnosed plaintiff with schizophrenia[4] (provisional) and assigned him a Global Assessment of Functioning score of 45-50.[5] [AR at 331.] Dr. Mejia prescribed plaintiff Zyprexa, Depakote, Celexa, Trazodone, and Cogentin.[6] [AR at 334-35, 380-81.]

---

[4] According to the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), the characteristic signs and symptoms of schizophrenia include positive symptoms, such as delusions, hallucinations, disorganized speech (e.g., frequent derailment or incoherence), and grossly disorganized or catatonic behavior; and negative symptoms, such as affective flattening, alogia, or avolition. DSM-IV, at 298-302 (4th ed. 2000).

[5] A Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations. See DSM-IV, at 32. A GAF score in the range of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning (e.g., unable to keep a job). Id. at 34.

[6] Zyprexa is used for, among other things, "[a]cute and maintenance treatment of Schizophrenia in adults." Physicians' Desk Reference, at 1984 (64 ed. 2010). Depakote is used for, among other things, "[a]cute treatment of manic or mixed episodes associated with bipolar disorder, with or without psychotic features," and "[p]rophylaxis of migraine headaches." Id. at 426. Celexa is used to treat depression. Id. at 1154. Trazodone is used to treat depression. See http://www.webmd.com/drugs/mono-89-TRAZODONE+-+ORAL.aspx?drugid=11188&drugname=Trazodone+Oral&source=2. Cogentin is used to treat "symptoms of Parkinson's disease or involuntary movements due to the side effects of certain psychiatric drugs."
(continued...)

In the decision, the ALJ noted Dr. Mejia's initial GAF assessment [see AR at 19, 21] and some of plaintiff's psychiatric symptoms observed by Dr. Mejia (i.e., feelings of depression and diminished sleep and appetite) [see AR at 20], but did not mention Dr. Mejia's provisional diagnosis of schizophrenia or her observations that plaintiff experienced symptoms like auditory hallucinations (i.e., symptoms that, according to the DSM-IV, are commonly associated with schizophrenia). The ALJ concluded in the decision that Dr. Mejia's treatment notes supported the RFC determination because her notes showed that plaintiff's "condition improved with treatment which included therapy and medications" and that plaintiff's psychiatric symptoms returned only when he went off of his medication. [AR at 20-21.]

Because Dr. Mejia's treatment notes appear to indicate that plaintiff experienced psychiatric symptoms associated with schizophrenia (such as auditory hallucinations) even when plaintiff was apparently compliant with medication [see, e.g., AR at 354], it is not clear to the Court that the ALJ fully considered Dr. Mejia's treatment notes or that his RFC determination is wholly consistent with Dr. Mejia's opinion of plaintiff's psychiatric condition. See Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (error for an ALJ to ignore or misstate the competent evidence in the record in order to justify his conclusion). At the same time, however, because Dr. Mejia did not complete an assessment of plaintiff's mental functional limitations or update her provisional diagnosis of schizophrenia, it is also not clear that the ALJ's RFC determination is wholly inconsistent with Dr. Mejia's findings, or that the ALJ's failure to find schizophrenia to be a severe impairment, if error, was not harmless. See Sample v. Schweiker, 694 F.2d 639, 643 (9th Cir. 1982) (a diagnosis does not make an impairment per se disabling; rather, "there must be proof of the impairment's disabling severity") (quoting Rhodes v. Schweiker, 660 F.2d 722, 723 (9th Cir. 1981)). Since this issue can be clarified on remand, i.e., with an evaluation of plaintiff's updated treatment records, the Court exercises its discretion not to resolve this issue in this Order. The ALJ is directed to

---

[6](...continued)
See http://www.webmd.com/drugs/drug-13533-Cogentin+Oral.aspx?drugid=13533&drugname=Cogentin+Oral&source=1.

consider on remand if plaintiff's schizophrenia is a "severe" impairment, and what, if any, impact this impairment has on the disability assessment.

## VI.
## REMAND FOR FURTHER PROCEEDINGS

As a general rule, remand is warranted where additional administrative proceedings could remedy defects in the Commissioner's decision. See Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir.), cert. denied, 531 U.S. 1038 (2000); Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir. 1984). In this case, remand is appropriate in order for the ALJ to reconsider plaintiff's ability to perform other work at step five, and whether plaintiff has the severe impairment of schizophrenia. The ALJ is instructed to take whatever further action is deemed appropriate and consistent with this decision.

Accordingly, **IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

DATED: October 27, 2010

PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE